UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20878-CR-KING

UNITED STATES OF AMERICA

vs.

RENZO GADOLA,

    Defendant.
_____/

## STATEMENT OF FACTS

    The United States Attorney's Office for the Southern District of Florida, the United States Department of Justice, Tax Division, and the defendant, RENZO GADOLA, stipulate to and agree not to contest the following facts, and stipulate that such facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, provide a sufficient factual basis for the plea of guilty in this case:

## OBLIGATION TO REPORT WORLDWIDE INCOME
## AND FOREIGN BANK ACCOUNTS

    The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

    United States citizens, resident aliens, and legal permanent residents of the United States were required to file an individual income tax return with the IRS reporting their worldwide income for each year if their gross income exceeded a certain amount.

    United States citizens, resident aliens, and legal permanent residents of the United States had an obligation to report to the IRS on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained. United States citizens and residents had an obligation to report all income earned from foreign bank accounts on the tax return.

    United States citizens, resident aliens, and legal permanent residents of the United States who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial

Accounts on Form TD F 90-22.1 (the "FBAR"). The FBAR for the applicable year was due by June 30 of the following year.

An "undeclared account" was a financial account maintained in a foreign country that has not been reported to the United States government on a tax return and an FBAR.

## UBS AG

UBS AG, a corporation organized under the laws of Switzerland, directly and through its subsidiaries, operated a global financial services business. As one of the biggest banks in Switzerland and largest wealth managers in the world, UBS provided banking, wealth management, asset management and investment banking services, among other services, around the globe, including through branches located in the United States (including the Southern District of Florida).

## THE IRS'S VOLUNTARY DISCLOSURE PROGRAM

The Offshore Account Voluntary Disclosure Program ("Voluntary Disclosure Program") was a program administered by the IRS that was intended to serve as a vehicle for U.S. taxpayers to disclose their previously undeclared offshore accounts and pay tax on the income earned in those accounts. Under the Voluntary Disclosure Program, the participants pay tax on the unreported income, a 20% accuracy penalty on the tax, a 20% penalty on the high balance of the undeclared account, together with interest, related to their failure to disclose their accounts in an attempt to avoid criminal prosecution.

## FORMER UBS BANKER "SWISS BANKER"

Unindicted co-conspirator "SWISS BANKER" was a citizen of and resident of Switzerland. From the late 1990's through mid-2003, SWISS BANKER was a private banker and executive director for UBS's North America International business, which included the United States cross-border business. SWISS BANKER serviced hundreds of undeclared accounts at UBS that were owned and controlled by U.S. taxpayers. SWISS BANKER also met with United States clients at various locations in the United States and Switzerland to service their accounts. After leaving UBS, SWISS BANKER started his own independent investment entity in Switzerland, where SWISS BANKER continued to provide banking services and investment advice for United States clients with undeclared accounts.

## "U.S. CLIENT"

Unindicted co-conspirator "U.S. CLIENT" was a citizen of the United States and resided in the Northern District of Mississippi. In or about 1999, U.S. CLIENT and his siblings inherited an undeclared account at UBS from their recently-deceased mother.

## RENZO GADOLA

RENZO GADOLA is a Swiss citizen who attended college in the United States at Jacksonville University. GADOLA received a Masters in Business Administration from George Washington University in Washington, D.C. GADOLA has a United States Social Security Number and obtained a drivers' license from the State of California. GADOLA is a registered investment advisor with the United States Securities and Exchange Commission ("SEC").

From the late 1990's through approximately 2008, RENZO GADOLA was a private banker at UBS in Switzerland. Until 2004, RENZO GADOLA serviced hundreds of undeclared accounts at UBS that were owned and controlled by U.S. taxpayers. From 2004 through 2008, RENZO GADOLA worked for UBS Swiss Financial Advisors, a wholly-owned subsidiary of UBS that was registered as an Investment Adviser with the SEC.

In order to assist U.S. taxpayers to conceal their assets and income from United States authorities, RENZO GADOLA routinely traveled to the United States to meet with clients who maintained undeclared accounts at UBS. Among other places, RENZO GADOLA met in California, Florida and New York.

In order to assist U.S. taxpayers to conceal their assets and income from United States authorities, RENZO GADOLA routinely met in Switzerland with clients who maintained undeclared accounts at UBS.

RENZO GADOLA operates as an independent investment manager under the business name RG Investment Partner AG. SWISS BANKER made it known that he was working with RENZO GADOLA to market private banking services to United States clients.

## THE UNDECLARED ACCOUNT OF "U.S. CLIENT"

In or about March 2000, in Atlanta, Georgia, U.S. CLIENT and his siblings met with SWISS BANKER to discuss their mother's undeclared account at UBS. SWISS BANKER verified that the account was undeclared and informed U.S. CLIENT and his siblings that they would need to travel to Zurich, Switzerland, to assume ownership of the undeclared account.

In or about March 2001, U.S. CLIENT and his siblings met with SWISS BANKER at UBS headquarters in Zurich, Switzerland, to discuss the undeclared account.

In or about 2002 through 2006, U.S. CLIENT met with SWISS BANKER in Zurich, Switzerland, on a number of occasions and discussed the undeclared account at UBS.

In or about 2002 or 2003, SWISS BANKER informed U.S. CLIENT that he was leaving UBS and taking approximately 150 clients with him.

3

In or about Summer 2006, SWISS BANKER met with U.S. CLIENT in Mississippi to prepare an estate plan for U.S. CLIENT. During the discussions, U.S. CLIENT revealed that over a number of years he had accumulated a substantial cash hoard that he kept in a safe deposit box.

In or about January 2007, as directed by SWISS BANKER, U.S. CLIENT traveled to New Orleans, Louisiana, and in a hotel room gave SWISS BANKER one-half of his cash hoard, approximately $200,000 in cash. No Form 8300 was filed with the United States Treasury reporting this transaction.

On or about April 26, 2007, as directed by SWISS BANKER, U.S. CLIENT traveled to New Orleans, Louisiana, and in a hotel room provided SWISS BANKER with the remainder of his cash hoard. SWISS BANKER provided U.S. CLIENT with a receipt for $245,000 in cash. The receipt noted: "Bank: Basler Kantonalbank ZH." No Form 8300 was filed with the United States Treasury reporting this transaction. While still in the United States, SWISS BANKER distributed the cash from U.S. CLIENT to his other United States clients.

In or about August 2007, at the request of SWISS BANKER, U.S. CLIENT traveled to Switzerland to open another undeclared bank account.

In or about September 2007, SWISS BANKER caused to be opened at Basler Kantonalbank an account whose beneficial owner was U.S. CLIENT. SWISS BANKER caused Swiss Francs and United States securities to be transferred into this account.

In or about Spring of 2009, SWISS BANKER traveled to Zurich, Switzerland, and signed certain documents to close his account at Basler Kantonalbank. SWISS BANKER told U.S. CLIENT that the funds went into SWISS BANKER's business account and that he would wire transfer the funds to U.S. CLIENT in the United States. As of December 2010, the funds had not been wire transferred to the United States.

In or about September 2009, U.S. CLIENT called SWISS BANKER to inform SWISS BANKER that he was participating in the IRS's Voluntary Disclosure Program. SWISS BANKER told U.S. CLIENT he did not need to participate in the Voluntary Disclosure Program because his accounts were too small and the account that U.S. CLIENT shared with his siblings was a family account. SWISS BANKER also told U.S. CLIENT that even if he did disclose to the IRS the UBS account, he should not disclose his account at Basler Kantonalbank, as disclosure would bring trouble for both of them.

After the September 2009 conversation, SWISS BANKER repeatedly called U.S. CLIENT in the United States to dissuade him from disclosing his Basler Kantonalbank account to the IRS. During one of the calls, SWISS BANKER told U.S. CLIENT that only five of his clients had applied for the Voluntary Disclosure Program and that entering into the program was unnecessary.

In or about September 2009, U.S. CLIENT informed SWISS BANKER that he and his siblings met with an attorney in order to enter into the Voluntary Disclosure Program. SWISS BANKER proposed that U.S. CLIENT provide the attorney with false explanations regarding the source of the funds in the Basler Kantonalbank account. Among other things, SWISS BANKER proposed that he could create fake bank records that would misrepresent the funds as the proceeds of a loan.

Throughout the spring of 2010, U.S. CLIENT requested that SWISS BANKER wire transfer his funds to either him or his attorney. SWISS BANKER refused to wire transfer the funds to the United States. Instead, SWISS BANKER requested that U.S. CLIENT travel to Zurich, Switzerland and retrieve the funds in cash.

On or about June 1, 2010, SWISS BANKER sent an email message to U.S. CLIENT in which he stated that U.S. CLIENT's funds could be repatriated to the United States either by physical transportation or by a wire transfer. SWISS BANKER cautioned that if funds were wired into the United States, they would have to falsely be documented as the proceeds of a loan.

On or about August 16, 2010, during a telephone conversation between U.S. CLIENT and SWISS BANKER, SWISS BANKER advised U.S. CLIENT not to disclose his Basler Kantonalbank account. Instead, SWISS BANKER suggested that U.S. CLIENT keep the money in Switzerland and over time repatriate the funds in small amounts in cash. SWISS BANKER expressed a reluctance to discuss any details of the repatriation scheme over the phone.

On or about September 22, 2010, during a telephone conversation between U.S. CLIENT and SWISS BANKER, SWISS BANKER stated that his partner "Renzo" would be in the United States and could meet with U.S. CLIENT to discuss his undeclared account and methods of repatriating the funds from the account. SWISS BANKER stated that "Renzo" has a company that "is registered with the SEC, so he is an official U.S. investment advisor. With a permit, you know, with a license to give investment advice in U.S. soil and all of that." SWISS BANKER further explained that "Renzo" traveled to the United States regularly and would soon be making a trip to Florida, New York, and possibly the West Coast.

On or about September 28, 2010, SWISS BANKER sent an email message to U.S. CLIENT in which he stated:

> My partner Renzo will be in Florida during the first half of Nov[ember]. Exact dates are not available yet. I will get back to you later to fix an appointment.

On or about October 25, 2010, SWISS BANKER sent an email message to U.S. CLIENT in which he stated:

> My partner Renzo will be in Florida from Nov. 6 - 10 and would like to meet with you. . . . He could update you on some of the pendings.

On or about October 29, 2010, SWISS BANKER sent an email message to U.S. CLIENT, copying RENZO GADOLA, in which SWISS BANKER stated:

> I am copying my partner Renzo Gadola on this mail. This way you two can make detailed arrangements. I gave him your phone number and suggest that he will contact you. He left for the U.S. yesterday. I think his first stop is in NYC. I informed him about our past relationship and gave him my advice that he will discuss with you.

On or about October 29, 2010, at Dulles International Airport in Sterling, Virginia, upon his entry to the United States, RENZO GADOLA signed a Customs Declaration on which he stated "no" to a question asking if business was the primary purpose of his trip to the United States. During his planned trip to the United States, RENZO GADOLA was scheduled to meet with clients in the following locales: Naples, Florida; Miami, Florida; Boston, Massachusetts; and New York, New York.

On or about November 1, 2010, RENZO GADOLA sent an email message to U.S. CLIENT, on which he copied SWISS BANKER stating that he would be in Miami, Florida, from November 6, 2010 to November 9, 2010 and that he could meet with U.S. CLIENT.

On or about November 3, 2010, RENZO GADOLA sent an email message to U.S. CLIENT, on which he copied SWISS BANKER, in which he requested to meet with U.S. CLIENT on November 6, 2010 at 1 p.m. at a hotel in Miami, Florida.

On or about November 6, 2010, RENZO GADOLA met with U.S. CLIENT at a hotel in Miami, Florida. During this meeting, RENZO GADOLA stated that he shared office space with SWISS BANKER in Switzerland, and that they were planning on integrating their businesses more in the near future. RENZO GADOLA explained that he planned to continue traveling to the United States to meet with clients because he is SEC registered and he "can travel to the states, as you can see. . . and I can meet my clients, I am here four or five times a year." RENZO GADOLA further explained that SWISS BANKER's job in the partnership is to "manage the assets, and managing assets, you can do that from anywhere."

During the meeting on or about November 6, 2010, RENZO GADOLA provided the following advice to U.S. CLIENT regarding disclosing the Basler Kantonalbank account to the United States government:

> In your particular instance [SWISS BANKER] told me there is really, the likelihood that you will be found out, that they will somehow, you know, sometime, somehow find out about the account is practically zero percent. So he really, he was very adamant about you not going forward and going through with the voluntary disclosure.

Later in the conversation on or about November 6, 2010, RENZO GADOLA further provided U.S. CLIENT with instructions from SWISS BANKER regarding disclosure of the Basler Kantonalbank account:

> In your particular case, [SWISS BANKER] told me because of the circumstances and the way, you know, everything happened, you should not go through [with] the voluntary disclosure.

During the meeting on or about November 6, 2010, RENZO GADOLA called SWISS BANKER on his cell phone. After RENZO GADOLA spoke with SWISS BANKER on the phone, RENZO GADOLA told U.S. CLIENT the following regarding the possibility of the Basler Kantonalbank account being discovered by the United States:

> There is no paper trail because the money [was] put [in] cash in Basler Kantonalbank. [SWISS BANKER] then withdrew the money cash - it's in a safe in our office. For about a year, the money has been out of Basler Kantonalbank. You have no link to UBS whatsoever, so 99.9% you have nothing to worry about.

During the meeting on or about November 6, 2010, RENZO GADOLA handed the phone to U.S. CLIENT so that U.S. CLIENT could speak to SWISS BANKER. During that conversation, SWISS BANKER again instructed U.S. CLIENT not to disclose the Basler Kantonalbank account in the Voluntary Disclosure Program. SWISS BANKER told U.S. CLIENT there was no "paper trail" of the Basler Kantonalbank account or the funding of the Basler Kantonalbank account. SWISS BANKER told U.S. CLIENT he was looking into ways to repatriate the funds to U.S. CLIENT.

7

On or about November 8, 2010, upon arrest by federal law enforcement officers, RENZO GADOLA claimed that there must be some mistake, as he was a registered investment advisor with the SEC and produced documentation of his SEC registration.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: _____
KEVIN M. DOWNING
SENIOR LITIGATION COUNSEL
MARK F. DALY
MICHELLE M. PETERSEN
TRIAL ATTORNEYS
UNITED STATES DEPARTMENT OF JUSTICE
TAX DIVISION

By: _____
JEFFREY A. NEIMAN
ASSISTANT UNITED STATES ATTORNEY

By: _____
PETER RABEN
ATTORNEYS FOR DEFENDANT

By: _____
RENZO GADOLA
DEFENDANT

8